**UNITED STATES of America et al., Plaintiffs,**

**v.**

**CORINTH MUNICIPAL SEPARATE SCHOOL DISTRICT et al., Defendants.**

**No. EC 66–80–K.**

United States District Court, N. D. Mississippi, E. D.

May 19, 1976.

Samuel J. Flanagan, Dept. of Justice, Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., for plaintiffs.

James E. Price, Corinth, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

Today we are called upon to decide at what point a federal district court is warranted in terminating injunctive orders in a public school desegregation case and finally dismissing the action. We regard this issue as one of major import and thus deserving most careful treatment of both facts and law.

On November 25, 1975, the defendant Corinth Municipal Separate School District,

its superintendent and board of trustees (hereinafter the district) moved to dissolve all outstanding injunctive orders and to dismiss this long-standing school desegregation case, on the ground that the district has achieved unitary status and has, continuously for the last 7 years, operated only unitary schools without vestiges of the former dual system. On December 16, the United States, as plaintiff, responded to the motion by observing that, since 1969, the district had experienced an overall increase of 17 white teachers while the number of black teachers had declined by 15. This change in the racial composition of the district's faculty suggested to government counsel that a substantial question might exist as to the district's achievement of a unitary system; consequently, the government sought to obtain more information through discovery before taking a final position.

On January 27, 1976, this court considered the motion filed by the school district and the government's tentative response and, by special order set the matter for evidentiary hearing. We also directed the defendants to publish the order and hearing date in a newspaper published and having a general circulation in Alcorn County, Mississippi, in which the district is located, so as to give public notice of the hearing to all interested citizens in the area and to provide any who wished to do so an opportunity to object to the entry of the order sought by the defendant, or to present pertinent testimony. This was done.[1]

On February 20, the government filed a more elaborate response, conceding that full desegregation of the student body had occurred, as had unitization of services, facilities, student activities and programs, and transportation. Indeed, the government's position was that the sole obstacle to a declaration of full unitary status was the district's employment practices in the hiring of teachers. As to this aspect of the case, the government sought affirmative supplemental relief, demanding that the district make offers of employment to black teacher applicants who had allegedly been denied jobs discriminatorily, and requesting the court to order institution of an affirmative action hiring program designed to increase the number of black teachers employed in the district. It was upon this basis that the government also opposed the district's request for a final order of dismissal of the case. With the issues thus framed, we conducted an evidentiary hearing on April 1, receiving a substantial amount of stipulated and documentary evidence, as well as oral testimony. At the conclusion of the hearing we delivered from the bench informal findings of fact and conclusions of law, which are incorporated in this memorandum in discharge of our Rule 52 responsibilities.

I

As a Mississippi public school system, the Corinth Municipal Separate School District operated for decades as a dual, racially segregated system, permissible before *Brown I* but impermissible thereafter. On October 3, 1966, the United States commenced this school desegregation action. Subsequently, the late Judge Claude F. Clayton, then serving as district judge, issued various orders directing implementation of a freedom-of-choice desegregation plan, then acceptable under federal case law. From time to time, the original freedom-of-choice plan was, on motions for supplemental relief by the government, modified to bring the district in line with developing constitutional doctrine.

On August 12, 1968, in response to the virtual invalidation of the freedom-of-choice plan in *Green v. County School Board of New Kent County, Virginia*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), we, the incumbent judge, mandated

---

1. By the published order, the hearing was originally set for February 23. Subsequent scheduling difficulties forced a postponement to April 1. Although the revised hearing date was not published to Alcorn County residents, we have not been made aware of any complaint or offer of testimony made prior to April 1 by any Alcorn County citizen to either the district or the United States; nor did any citizens contact this court in a timely manner.

geographical student attendance zones for the 1968–69 school year for grades 1–6; grades 7–12 were ordered unitized beginning with the 1969–70 school year. After one year's experience under this order, we again modified the desegregation plan on April 15, 1969. This 1969 order, which was presented to the court by the parties in the posture of a consent decree, provided for student assignment, bus transportation, services, facilities, activities and programs, and dealt specifically with desegregation of faculty and staff:

> "1. *Faculty Employment.* Race or color shall not be a factor in the hiring, allocation, reallocation, promotion, demotion, or dismissal of teachers or other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or correcting the affect [sic] of the segregated assignment of faculty and staff in the dual system. Teachers, principals, and staff members shall be employed at individual schools so that the faculty and staff is not composed exclusively of members of one race. *Wherever possible, teachers shall be contracted for so that in each of defendants' schools, there shall be not less than one out of every six classroom teachers who is of a different race than that of the majority of the teachers in the Corinth Municipal Separate School District.* Defendants shall take positive and affirmative steps to accomplish the complete desegregation of their school faculties and staff by the 1969–70 school year." (Emphasis added)

On August 17, 1970, the parties agreed to the entry of another consent order which made minor modifications, irrelevant here, to the basic 1969 plan. Although the district thereafter remained under the court's continuing jurisdiction, submitting annual reports on the progress of desegregation, there has been no activity of any kind in this case by any of the parties for the more than 5 years between the 1970 consent decree and the district's present motion to terminate this action.

Notwithstanding its apparent satisfaction with the course of Corinth's desegregation, the government today opposes the district's motion and seeks supplemental relief. As contended by government counsel, the post-1969 decline in black representation on the district's faculty, when considered together with the district's employment of a number of white applicants into teaching positions for which blacks of allegedly equal or superior qualifications had previously applied, makes out a prima facie case of discrimination in violation of this court's order, the Fourteenth Amendment and Title VII of the Civil Rights Act of 1964, thus casting the burden upon the district to rebut the inference of racial discrimination by clear and convincing evidence. The government contends this continuing discrimination not only makes impossible termination of the case at this time, but indeed requires affirmative supplemental relief, including judicially-mandated affirmative action hiring program and directing the district, as vacancies arise, to offer teaching positions to identifiable black applicants who were previously victimized by the district's alleged discriminatory practices. The district denies all claims of racial discrimination in the employment of faculty and staff since the entry of the 1969 desegregation order.

## II

For the past 8 years, the black/white ratio in the district's student population has remained stable, with blacks comprising 25–28% of the total enrollment.[2] This is in

---

2. The district's total student enrollment for the years in question breaks down as follows:

| | White | Black | Total | % Black |
|---|---|---|---|---|
| 1968–69 | 1976 | 658 | 2634 | 25 |
| 1969–70 | 1642 | 655 | 2297 | 28 |
| 1970–71 | 1787 | 624 | 2411 | 25 |
| 1971–72 | 1674 | 605 | 2279 | 26 |
| 1972–73 | 1601 | 585 | 2186 | 26 |
| 1973–74 | 1654 | 610 | 2264 | 26 |
| 1974–75 | 1578 | 563 | 2141 | 26 |
| 1975–76 | 1511 | 561 | 2072 | 27 |

contrast to the total population figures for the area, which reveal that in 1970, the population of Corinth was 11,581, of which 2,222, or 19.2%, were black; Alcorn County then had a population of 27,170, of which 3,171, or 11.5%, were black. 1970 Official United States Census. Student enrollment has, during this period, settled into a gentle but steady decline from 2,634 students in the 1968–69 school year to 2,072 students now enrolled in the 1975–76 session. This drop-off, which has affected both blacks and whites to a substantially equivalent degree, cannot be ascribed to any factors related to public school desegregation or other factors related to race in the public school setting. The decrease is instead due to a general decline in Corinth's school-age population. Though enrollment has declined, the district's faculty has remained constant, ranging in size from 120–130. The racial composition of the faculty, however, has changed somewhat. In 1968–69, the first year of effective desegregation, blacks comprised 32% of the district's teaching faculty; in 1969–70, the initial year of operation under the court's 1969 faculty desegregation decree, 25% of the teachers were black. By 1975–76, this figure had dropped to 19%.[3]

The proof shows without contradiction, indeed it is stipulated by the parties, that today and continuously for the past 5 years, all school buildings in use in the district are fully desegregated with respect to classrooms; likewise, the district faculty is and has been completely desegregated in each school. All school services programs, activities and transportation are and have been desegregated throughout the system for more than 5 years.

The advent of desegregated public school education did not occasion in Corinth white flight or produce a chaotic educational environment. In fact, there are no racially segregated private schools within or near the district; the nearest such all-white

academy appears to be in a distant county 65 miles to the west. There is no evidence that any students, white or black, have been withdrawn from Corinth's public schools for desegregation-related causes.

The proof shows that both the black and white communities at Corinth have accepted public school desegregation in a spirit of cooperation and good will, and all elements of the populace have endeavored to make desegregated education successful. Experience teaches that there are several reliable tests by which the success of desegregation in a locality may be judged. First, we may inquire whether desegregation has precipitated an exodus of white students from the public school into all-white private schools. Here, nothing of the sort has occurred. Second, we should consider whether the newly-desegregated schools have been attended by boycotts, demonstrations or violence, or whether black students have protested educational policies fostered by what might be considered a white administration. School conditions at Corinth have been, if not serene, at least uninterrupted by distractions of this type and there is no proof that any turmoil has disturbed the educational process. Third, have there been convincing efforts by both whites and blacks in the community to establish a significant dialogue between the school officials and minority race members? In this regard there is no question. The court has received unrebutted evidence of substantial cooperation and of constructive and open discussion of problems flowing from the operation of racially mixed schools. There is a dearth of evidence that the district at any time has been obstinate or callous to the expressed wishes of parents of black students. To the contrary, the school officials have demonstrated genuine concern in this area. Indeed, in February 1974, William Martin, a black, was appointed to the school board and has served in that capacity ever since that time. At the hearing Mr.

3. The complete figures for faculty, as stipulated to by the parties, are as follows:

| | White | Black | Total | % Black |
|---|---|---|---|---|
| 1968–69 | 84 | 40 | 124 | 32 |
| 1969–70 | 91 | 30 | 121 | 25 |
| 1970–71 | 94 | 28 | 122 | 23 |
| 1971–72 | 94 | 27 | 121 | 22 |
| 1972–73 | 94 | 26 | 120 | 21 |
| 1973–74 | 101 | 26 | 127 | 20 |
| 1974–75 | 105 | 25 | 130 | 19 |
| 1975–76 | 104 | 25 | 129 | 19 |

Martin gave convincing testimony that the board seriously considers the viewpoint of the black community and is actively concerned with the slippage in the number of black teachers at the secondary level.

Another, perhaps more telling method by which the success of a desegregation effort may be measured is whether the community has been willing to sustain financially its support of the local desegregated public education. Nowhere is this question more starkly presented than in a school bond issue election. This court may properly take judicial notice that in many municipalities throughout Mississippi school bond elections have had a high mortality rate since the establishment of unitary schools. Although there are significant nonracial explanations for the inability of these bond issues to pass, and while defeat of a proposed bond issue, without more, cannot be considered as proof of racial polarization in a community, this court knows that without broadly-based biracial support for public education in a community, the bond issue will almost surely fail.[4] In that context, it is highly significant that only last year in a school bond issue election, 92% of voting Corinthians agreed to assume an additional $600,000 of indebtedness to make physical improvements of their public schools. This virtual unanimity of the voting electorate compels the conclusion that public desegre-

gated education at Corinth has won a remarkable acceptance.

Thus, the plain facts, as the government concedes in all areas of concern save one, are that the district has achieved complete and successful desegregation and maintained school harmony for more than 5 years. As to these aspects of this court's prior orders, a unitary school system unquestionably exists.

The only remaining barrier to final dismissal of this action relates to the issue of teacher employment. As noted, over the last 8 years the number of black teachers in the system has declined by 15, while the number of white teachers has increased by 20.[5] This racial shift has not occurred, however, through a reduction in staff incident to desegregation. When geographic zoning was ordered in Corinth, the school board determined that no teacher should be discharged as a result; consequently, there have been no *Singleton* discharges by the district. The record also reflects that, from 1969 to the present, no black teacher has ever been involuntarily terminated in employment, and the government makes no claim that any black teachers have received impermissible demotions since desegregation. Nor has any black teacher or applicant for a teaching position brought an independent action against the school officials claiming racial discrimination in employment practices.[6]

---

4. The necessity for biracial support is especially acute in Mississippi, where passage of public school bond issues requires the affirmative vote of 60% of those voting in the bond issue election, and not a simple majority. Miss.Code Ann. § 37–59–17 (1972).

5. Though not specifically pressed by the government, the district officials themselves recognize the need for black representation in administrative positions in the district. The present administrators, who are all white, are professionals of long tenure, and as the court understands it, there have been no administrative vacancies occurring during the period under review. The defendants have assured the court of their conviction that black administrators are needed to convince all elements of Corinth's biracial community that the public school system belongs and is responsive to all its citizens.

6. As part of the government's response to the district's present motion, it was revealed that Mrs. Mary Thompson, a black teacher currently employed by the Alcorn County school system, had in 1973 applied for a teaching position as a general elementary teacher in the Corinth system but was not employed. Mrs. Thompson complained of racial discrimination to the government, which specifically raised the status of her case in these proceedings.

When Mrs. Thompson's grievance became known, the district reviewed her original application and conducted a personal interview with her. Although the district did not retreat from its original position that Mrs. Thompson was unqualified for the general elementary position for which she applied, she was found qualified to teach business education on the secondary level, and possibly remedial reading and special education on the elementary level. After the interview, the district agreed to offer Mrs. Thompson employment for the first vacancy

What then has occurred has been a steady and perceptible decline in the number of black teachers in the Corinth system, due in the main to the voluntary resignation or retirement of black teachers, who were, more often than not, replaced by whites. It should be noted, however, that according to the stipulated proof the turnover rate among black teachers is far less than among whites, who, by choice, are more apt to have shorter tenure in the system. Even so, black teacher representation has declined.

Since the 1969–70 school year, 127 of the 137 new hires into teaching positions at Corinth have been whites, with black new hires numbering only 10, or 7% of the total. Also, it may be significant to note the undisputed figures relating to applicants for teaching positions. Dating to the 1969–70 school year, 430 whites have applied for teaching positions as compared with 64 blacks. Of those applicants, 29.5% of the whites were hired, as compared with only 15.6% of the blacks.

When these figures are coupled with the defendants' testimony before this court, several factors emerge as responsible, at least in large part, for the decline in the black teacher population. First, the district's geographical location, adjacent to Tennessee and very near Alabama, places it into competition with public school districts of the two neighboring states capable of offering higher salaries to qualified blacks and makes recruitment of black teachers more difficult.

Second, the relatively small black population of Alcorn County (11.5%) reduces somewhat the potential pool of black applicants for teaching positions. This is so not only because the number of resident black potential applicants is small in comparison with their white counterparts, but also, it is reasonable to infer, because the number of black Alcorn County natives graduating from regional universities and seeking to return home to pursue teaching careers would be most probably diminished.

Further, it appears that the district has consistently misinterpreted this court's desegregation order of April 15, 1969, requiring that "[w]herever possible, teachers shall be contracted for so that in each of defendants' schools, there shall be not less than one out of every six classroom teachers who is of a different race then that of the majority of the teachers in the Corinth Municipal Separate School District." Although the source of this portion of our order is unclear (it appears to have originated with Department of Justice counsel as part of the consent decree), this language was directed at the initial desegregation of faculty and staff, effective for 1969–70 school year, and was not intended to establish a permanent racial hiring ratio. Nevertheless, the uncontradicted testimony of school officials is that the defendants construed this portion of the order to require that blacks comprise approximately 16% of the faculty of each district attendance center.

The proof shows that, especially in the early years after the 1969 order, a disproportionately large number of black teachers were assigned to the South Corinth Elementary School.

In an effort to satisfy the 1–6 ratio, the defendants until 1974 made a conscious effort to place additional white teachers in this particular elementary school, perhaps even to the extent of preferring white applicants over blacks in an effort to secure a racially balanced faculty. In the other schools, hiring after the 1969 order proceeded wholly without regard to race. In those schools, the 1–6 ration has by and large been maintained, except at Corinth Junior-Senior High School, where in 1975–76 only 4 of 47 faculty members were black. Dr. O. Wayne Gann, school superintendent since 1974, explained the imbalance there by testifying that it is exceedingly difficult to secure black secondary school teachers be-

which occurred in any of the fields for which she was qualified. This proposal proved agree-

able to all the parties, and Mrs. Thompson's individual complaint has been withdrawn.

cause of more rigid instructional requirements for certification at this educational level.[7] Since July 1, 1974, all hiring at the South Corinth Elementary School has been without regard to race, and this policy has continued throughout the schools of the system except at the junior-senior high school, where blacks are still preferred in an effort to attain a more balanced biracial faculty.

Dr. Gann also testified, without contradiction, that the district currently maintains an active recruitment program for black teachers, carried on at predominantly black colleges both in Mississippi and Tennessee, as well as at predominantly white colleges. No such affirmative recruiting program exists for whites.

Both Gann and Martin emphasized the school board's commitment to securing additional black teachers; both testified that the board had instructed Gann to actively seek black instructors, not only to comply with our 1969 order but also because the board believes, as a matter of educational policy, that black teachers are needed to serve as role models for black students of high school age and as authority figures with whom black students can identify and more effectively communicate. The district also submitted for the court's consideration its hiring policy which, although formally adopted by the board only a week before the April 1, 1976, hearing, had been substantially followed on a more informal basis for some time.[8]

**7.** While elementary teachers may apparently be qualified to teach regardless of their college major, it appears that secondary teachers, who instruct in only one subject matter, must have majored and be certified in that particular subject before qualified to teach in Mississippi's public schools.

**8.** "The following criteria will be applied in the employment of professional personnel in the Corinth Municipal Separate School District effective upon and after the date of its adoption by the Board of Trustees of said School District.

1. *Degree held.* Preference will be given to (a) a person holding at least a masters degree; (b) a person holding a bachelors degree; and (c) a person with no 4-year college degree.

2. *Certification.* Preference will be given to a person holding the highest state certification in the grade level, subject-matter area, counseling, administrative, or other position for which the person is being considered. Only when no acceptable person so certified is available will consideration be given a person who does not hold full certification. This criterion is not applicable to teacher-aides.

3. *Years of experience with previous satisfactory service in the system.* Preference will be given to a person with previous successful service in the system over one new to the system. Among those already in the system, preference will be given to the person with the largest number of years of successful experience.

4. *Total Experience.* When a factor, preference will be given to the person with the largest number of years of successful experience.

5. *Full/part-time employment.* For continued employment, preference will be given to a person whose most recent assignment was full-time over a person whose most recent assignment was part-time.

6. *Health and physical fitness for teaching.* The health and physical fitness of applicants will be considered as a factor in employment.

7. *References.* Due consideration will be given to personal references on previous experience, character, and any other factors pertinent to professional competency.

8. *Interview.* All applications will be screened according to the stated criteria for employment and those applicants who emerge as the potential candidates will be interviewed by the appropriate administrator(s). Preference will be given to those who, in the professional opinion of said administrator(s), appear to be best qualified for the position.

9. *Spouse of employee of district.* Preference will be given to the spouse of a person employed in the school district.

10. *Other factors.* In the event the criteria for employment does not indicate a clear choice of the candidates, then, by necessity, the administration will make a recommendation to the Board based on other factors, *not* to include sex, race, color, religion or national origin.

11. *Accreditation.* Preference will be given to a person whose highest degree was earned from an institution presently accredited at that level by the National Council for Accreditation of Teacher Education (NCATE) over a person whose highest degree was earned at an institution not so accredited. This criterion is not applicable to teacher-aides.

12. *Current applications.* All applications will be kept on file in the office of the Superintendent. Applications for a given school year will remain in current status until the end of the said school year. Applications

## III

In placing these facts into their proper constitutional perspective, we cannot ignore the statistical evidence presented by the government, for "[i]n the problem of racial discrimination, statistics often tell much, and Courts listen." *State of Alabama v. United States,* 304 F.2d 583, 586 (5 Cir. 1962). We are equally aware that though statistics are appealing to the judicial mind, they should not be taken to suggest more than they mean. It is important, therefore, that we correctly interpret the government's data as we inquire whether a prima facie case of racial discrimination in teacher employment has been made out.

█ In the first place, and as already noted, while blacks in 1970 constituted 25% of the district's total enrollment, the *total* black population of all ages in the area was between 11.5% and 19%, thus reflecting that in Corinth, as in other areas, the black population is younger than the white population. Thus, in the years of segregated education in Corinth, when students were taught only by teachers of the same race, an artificially large proportion of black teachers, as compared with the number of black teachers available in the labor market, was employed by the district. For example, in the pre-unitary school year of 1967–68, 31% of the student enrollment was black, and blacks made up 31% of the total

faculty. When, after unitization of students and faculty, race became irrelevant in teacher assignment, it was to be expected that, without racial discrimination in the district's hiring practices, black representation on the faculty would eventually settle to the level of Corinth's black population, or 11%–19%. Thus, a gradual decline in black faculty representation to the present level of 19% would not establish a prima facie case of racial employment discrimination, in part because no disparity would be shown between the presence of black teachers in the work force (i. e., on the faculty) and the presence of blacks in the relevant hiring market.[9] Compare *U. S. v. Hayes International Corp.,* 456 F.2d 112 (5 Cir. 1972).

We therefore consider as the basic problem in this case not the fact of the decline, but the rate at which it has occurred. Since 1969, 13% of the teacher applicants have been black. This is within the statistical range in which blacks might be expected to apply in a racially neutral environment and yields no inference of racial discrimination. Of these applicants, however, 29.5% of white applicants have been hired, while 15.6% of black applicants have been initially employed. This disparity in application acceptance is the only statistical evidence presented by the government which might suggest an impermissible racial consideration by the district officials in their school operations since our 1969 order.[10]

will be renewed and placed in current file upon request from the applicant.

13. *Recruitment.* In the event no applications are on file for a vacancy or in the event none of the applicants on file are satisfactory, the administration will solicit application from colleges and/or universities, the State Department of Education, other school systems, etc., with no discrimination based on sex, race, color, religion, or national origin.

14. *Presentation to Board.* The administration will submit a list of all applicants certified for the position when a candidate is recommended for initial employment."

9. Also in part because the Constitution does not freeze the black-white faculty ratio as of the date of initial faculty desegregation. Once successful desegregation has occurred, "the system-wide racial ratio may thereafter change from time to time as a result of non-discrimina-

tory application of objective merit standards in the selection and composition of faculty and staff." *Carter v. West Feliciana Parish School Board,* 432 F.2d 875, 878–79 (5 Cir. 1970); accord, *McCormick v. Attala County Board of Education,* 407 F.Supp. 586, 596–97 (N.D.Miss. 1976).

10. The government presents figures demonstrating that only 7% of newly hired Corinth teachers since 1969–79 have been black, but this is simply a restatement of the result of the disparity in application acceptance. The government also has submitted 13 instances in which white applicants were hired for teaching positions for which blacks of allegedly equal or superior qualifications had previously applied. We have examined this evidence, but find it to be inconclusive on the issue of racial discrimination.

No black teacher in the Corinth system, past or present, has ever come forward to complain of racially motivated treatment; no effort has ever been made by school officials to resegregate faculty or staff. Neither does the record reveal that any unsuccessful black applicant for a teaching position has ever complained of racial bias by school officials, either to the Equal Employment Opportunity Commission (the Commission) or to any court.[11] In this regard, it is especially significant that the stringent *Singleton* criteria for dismissal of public schoolteachers incident to desegregation has no application whatever to this case. See *Pickens v. Okolona Municipal Separate School District,* 527 F.2d 358 (5 Cir. 1976). And, though the government argues that the district's policy of maintaining a system-wide 1:6 faculty ratio itself establishes a per se Fourteenth Amendment violation which justifies denial of the district's motion to dismiss, this argument overlooks the fact that this policy was instituted in supposed compliance with our 1969 order, and thus no invidious discrimination may fairly be imputed to the district for its actions in this regard.

In sum, the evidence adduced by the government does not, by itself, present a prima facie case of a pattern or practice of employment discrimination which can withstand the district's nondiscriminatory explanations heretofore discussed, at least for purposes of closing this desegregation case.

In any event, this is not a Title VII case in which a pattern or practice charge of racial discrimination in employment might most appropriately be litigated; this is a suit brought pursuant to Section 407 of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6,[12] which empowers the Attorney General to maintain actions against public school districts to "materially further the orderly achievement of desegregation in public education . . . ." Desegregation, as defined by 42 U.S.C. § 2000c(b), contemplates "the assignment of students to public schools and within such schools without regard to their race, color, religion, sex or national origin . . . ." The scope of litigation permissible under § 2000c–6 has necessarily been held to include faculty and staff desegregation as well, and many courts, including this one, have held that a desegregated faculty is an indispensable element of a desegregated school system. *U. S. v. Greenwood Municipal Separate School District,* 406 F.2d 1086 (5 Cir. 1969); *U. S. v. State of Georgia,* 445 F.2d 303 (5 Cir. 1971); *U. S. v. Jefferson County Board of Education,* 372 F.2d 836 (5 Cir. 1966); *U. S. v. Tunica County School District,* 323 F.Supp. 1019 (N.D.Miss.1970), aff'd 440 F.2d 377 (5 Cir. 1971).

Nevertheless, the scope and duration of this action must be determined in light of its primary purpose, which is to eliminate Corinth's dual system of education, and not viewed as a Title VII pattern or practice

11. The exception which proves the rule in this regard is Mary Thompson, see note 6 supra, whose original rejection by Corinth officials we find free of racial taint and who has now found employment in the system.

12. "(a) Whenever the Attorney General receives a complaint in writing—
   (1) signed by a parent or group of parents to the effect that his or their minor children, as members of a class of persons similarly situated, are being deprived by a school board of the equal protection of the laws, or
   (2) signed by an individual, or his parent, to the effect that he has been denied admission to or not permitted to continue in attendance at a public college by reason of race, color, religion, sex or national origin,
   and the Attorney General believes the complaint is meritorious and certifies that the sign-
er or signers of such complaint are unable, in his judgment, to initiate and maintain appropriate legal proceedings for relief and that the institution of an action will materially further the orderly achievement of desegregation in public education, the Attorney General is authorized, after giving notice of such complaint to the appropriate school board or college authority and after certifying that he is satisfied that such board or authority has had a reasonable time to adjust the conditions alleged in such complaint, to institute for or in the name of the United States a civil action in any appropriate district court of the United States against such parties and for such relief as may be appropriate, and such court shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section, . . . ."

employment discrimination suit. Indeed, a serious question arises, which we need not decide, as to whether the Attorney General presently possesses authority independent of Equal Employment Opportunity Commission to bring pattern or practice discrimination suits, even as to public employers. By the Equal Employment Opportunity Act of 1972, Pub.L. 92–261, § 5, Congress removed from the Attorney General, effective March 24, 1972, the power to initiate pattern or practice suits and transferred that function to the Commission. 42 U.S.C. § 2000e–6(c). Title VII actions brought by the Attorney General prior to transfer date would continue unabated, with the Commission substituted as a party plaintiff for the Attorney General. 42 U.S.C. § 2000e–6(d). After March 24, 1972, the effective date of the Act, the Commission was given express authority to investigate and act on charges of a pattern or practice of discrimination, 42 U.S.C. § 2000e–6(e), which provided that "all such actions shall be conducted in accordance with the procedures set forth in section 2000e–5 of this title." We note that suit provisions in § 2000e–5 are set forth in subsections 5(f)(1) and (2). § 2000e–5(f)(1) requires the exhaustion of conciliation efforts before the Commission may bring a civil action against a respondent who is *not* a public employer; in cases where the respondent is a government, governmental agency or political subdivision, the Commis-

sion, when unable to secure an acceptable conciliation agreement, shall refer the case to the Attorney General who may then bring a civil action against such public agency in federal court. § 2000e–5(f)(2) authorizes prompt judicial action whenever the Commission concludes on the basis of preliminary investigation that such is necessary, in which event the Attorney General is authorized to proceed against a public employer. Whether the procedures outlined by § 5(f)(1) and (2) vest jurisdiction in the Attorney General to sue beyond the scope of any referral made by the Commission is problematical.[13] In the case sub judice, there is, of course, no evidence that the Commission has made referrals of any sort to the Attorney General which affect employment practices of the Corinth public schools.

■ The spirit, if not the letter, of this congressional decision is violated here, where, after a hiatus of 5 years, the Department of Justice seeks to initiate a pattern or practice employment discrimination suit under the guise of reviving an otherwise dormant desegregation case against a school district in which successful desegregation has long since been achieved.[14] Even if the Attorney General had authority to press Title VII claims against public employers without EEOC's participation and consent, no valid reason appears why, in the

**13.** The legislative history of the Equal Employment Opportunity Act of 1972 indicates a clear intent on the part of Congress to eliminate overlapping jurisdiction and duplicated functions by transfer of pattern and practice litigation generally to the Commission and thus avoiding undue burdens and harassment of persons charged with employment discrimination. See U.S.Code Cong. & Admin.News 1972, p. 2747 at pp. 2749–50.

**14.** Interestingly, Justice Department counsel argue that even should a full unitary system be found to exist in Corinth, the proper relief would be to substitute a general permanent injunction for our 1969 detailed regulatory order, presumably with the intent of keeping school officials under federal mandate indefinitely, if not in perpetuity. Though we are aware that some school districts have entered into *consent decrees* providing for a general permanent injunction under unitization, e. g., *Lee v. Macon County Board of Education*, C.A.

No. 70–251–5 (N.D.Ala., Feb. 19, 1975), we cannot accept the thesis that full compliance by local school authorities with a desegregation order will be unavailing to secure the relief here sought. The Corinth district rejects the notion of consenting to permanent injunctive relief. If school districts maintain good faith compliance with federal court desegregation decrees for a requisite period of time without serious incident of racial discrimination in educational policies, then justice under our federal system dictates that the judicial power of the United States courts, by injunctive orders or mandates, cease, and the responsibility for operating local public schools be left in the hands of the authorities designated by the states. Any other course would, in our opinion, stand our system of federalism on its head, by invading the authority of the state and its educational agents in excess of the demands of the Fourteenth Amendment.

unique factual circumstances of this case, he should be able to do so.[15]

This is not to say that claims of employment discrimination are irrelevant in desegregation cases. But we do say that in school districts such as Corinth, where public school desegregation has been markedly successful, a colorable claim of racial discrimination in employment made by the Department of Justice, unsupported by evidence sufficient to create a prima facie case, will not be permitted to serve as a vehicle by which the total operation of the public schools in that district may be held interminably subject to federal court supervision.

Here, we believe that, as a federal court, we have no further constitutional function to perform in this school system. The journey of the Corinth school district from *Brown I* to *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), has been successfully completed. Since this is so, the words of Chief Justice Burger, speaking for a unanimous court, are appropriate:

"At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in Brown I. The systems would then be 'unitary' in the sense required by our decisions in Green [*Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716] and Alexander [*Alexander v. Holmes County Board of Education*, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19].

"It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies [or faculties] once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary." 402 U.S. at 31–32, 91 S.Ct. at 1283, 28 L.Ed.2d at 575.

Today's decision is without prejudice to the vindication of federal right held by any individual, whether based on past, present or future conduct of the school officials. It seems hardly necessary, in closing this school desegregation case, to remind anyone that the doors of this federal district court remain open to redress grievances condemned by the Constitution and laws of the United States.

Let an order be issued accordingly.

---

15. In addition to the overwhelming evidence of good faith and successful desegregation presented by the defendants, and the failure of the Attorney General's case, those circumstances include the explicit stipulation by the Attorney General that, in all areas save its employment policies, Corinth has achieved unreserved unitary status. Indeed, government counsel frankly agreed to dismissal of all aspects of this case except the employment discrimination issue. Under these circumstances, to say that this action retains its character as a school desegregation suit, even in the government's eyes, is to ignore the reality of the situation.