**Derek Jerome SINGLETON, et al., Plaintiffs,**

v.

**JACKSON MUNICIPAL SEPARATE SCHOOL DISTRICT, Defendant.**

Civ. A. No. J3379.

United States District Court, S. D. Mississippi, Jackson Division.

Dec. 8, 1981.

Fred L. Banks, Jr., Jackson, Miss., for plaintiffs.

Christopher A. Shapley, Jackson, Miss., for defendant.

## OPINION AND ORDER

DAN M. RUSSELL, Jr., Chief Judge.

This action was commenced on March 4, 1963, by ten minor school age children against the School District. The Plaintiffs alleged that they suffered irreparable injury by the operation of a compulsory biracial school system by the School District. The first few years of litigation in this case were characterized by district court judgments in favor of the School District, followed by reversals of those judgments by

the United States Court of Appeals for the Fifth Circuit. Following the United States Supreme Court's decision in *Alexander v. Holmes County Bd. of Education*, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (5th Cir. 1969) ordered the immediate merger of faculties and staff, transportation services, athletics and other extracurricular activities and ordered the School District to prepare plans for merger of the student bodies into a unitary school system.

Pursuant to the directives of the Fifth Circuit, the faculty, staff, transportation, extracurricular activities and facilities of the School District were effectively desegregated. The only remaining impediment to the establishment of a unitary school system was the desegregation of the School District's student body. After a lengthy hearing, a student assignment plan utilizing minimum busing was ordered implemented by this Court on June 15, 1970. On appeal, the Fifth Circuit approved the student assignment plan for the secondary schools after numerous modifications, *Singleton v. Jackson Municipal Separate School District*, 430 F.2d 368 (5th Cir. 1970), and rejected the plan of pupil assignment for elementary schools. *Singleton v. Jackson Municipal Separate School District*, 432 F.2d 927 (5th Cir. 1970).

Subsequently, the School Board presented a student assignment plan for the elementary schools which was agreed to and accepted by the Plaintiffs, the United States Justice Department and a court-appointed biracial committee. This student assignment plan utilized busing, a majority to minority transfer plan, clustering, pairing, noncontiguous zoning, discontinuance of substandard buildings and educational parks. This student assignment plan for elementary schools was incorporated and made a part of a consent order entered by this Court on June 22, 1971.

All orders entered since 1971 have been entered by consent of all parties. The School District filed reports with this Court similar to those required in *United States v. Hinds*, 433 F.2d 611 (5th Cir. 1970). The first such report was filed on November 30, 1970. On August 23, 1973, this case was closed for statistical purposes, but the School District continued to file reports until April, 1975.

On June 12, 1981, the School District filed a Motion to Dismiss, alleging that the School District had fully complied with all desegregation directives and orders of this Court, and that the District had operated a fully desegregated, racially unitary school system for more than three years. Appropriate notice of this Motion to Dismiss was given to counsel for the Plaintiffs, and Plaintiffs were provided an opportunity to show cause why the dismissal should be further delayed.

An evidentiary hearing on the Motion to Dismiss commenced on September 14, 1981, and concluded on September 15, 1981. Several witnesses testified on behalf of the parties, and numerous documents were introduced into evidence. Based on the entire record before this Court, this Court now makes the following findings and conclusions.

■ The Supreme Court first characterized school systems as "dual" or "unitary" according to their racial status in *Green v. County School Board of New Kent Co., Va.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The court enunciated six criteria to be considered by a court in its determination of whether a school system was "dual" or "unitary":

1. Faculty;
2. Staff;
3. Transportation;
4. Extracurricular Activities;
5. Facilities;
6. Composition of Student Body.

In order to achieve unitary status, a school district must be fully integrated in all six respects. *Id.* at 435, 88 S.Ct. at 1692.

■ A period of three years in effective public school desegregation, absent extraordinary circumstances encountered by a particular school district which may vitiate the effectiveness of full desegregation, is adequate to demonstrate the establishment

of unitary schools. Once a school district has operated a fully desegregated, unitary school system for three years, the school desegregation case should be dismissed. As stated by the Fifth Circuit, "It has never been our purpose to keep these cases interminably in federal courts." *United States v. Texas*, 509 F.2d 192 (5th Cir. 1975), *Lemon v. Bossier Parish*, 444 F.2d 1400 (5th Cir. 1971).

The six criteria to be considered by this Court in its determination of whether the School District has achieved unitary status will be separately discussed below.

### 1. Faculty

As mandated by the Fifth Circuit in *Singleton v. Jackson Municipal Separate School District*, the School District merged the faculty of the former dual system and assigned the faculty so that the ratio of black to white teachers in each school within the District was the same as the racial ratio in the entire school system. After the initial desegregation, the faculty was approximately 58% white, 42% black. During the 1970–71 school year, the faculty was 58% white, 42% black. In 1971–72, it was 61% white, 39% black. In 1972–73, it was 58% white, 42% black. In 1973–74, it was 57% white, 43% black.

The School District has continued to maintain a desegregated faculty. During the 1981–82 school year, the School District employed 783 elementary teachers. 418 (53%) elementary teachers were black and 365 (47%) were white. The School District employed 421 junior high teachers. 233 (55%) were black and 188 (45%) were white. The School District employed 410 senior high teachers. 205 (50%) were black and 205 (50%) were white. The faculty ratio in each school, district wide, was evenly divided racially to the fullest extent possible so that each child within the School District would receive instruction from both black and white teachers.

### 2. Staff

#### A. Administrative and Supervisory

During the 1981–82 school year there were 126 persons employed by the School District on its administrative and supervisory staff. 60 of these administrators and supervisors were black, and 66 were white. Therefore, 48% of the administrative and supervisory staff were black and 52% were white. Blacks held the position of Executive Administrative Assistant, District Officer, Assistant Superintendent, General Administrative Officer, Director, Associate Director, Facilitator, Federal Project Evaluator, Program Developer, Supervisor and Assistant Director of Athletics. All are positions with significant responsibilities.

Amos Wright, a black, is the Executive Administrative Assistant. As such, he is next in line to the Superintendent in position and responsibility.

Dr. Joseph Pete, a black, is Assistant Superintendent for Elementary Education. As such, he is given direct responsibility over all elementary principals, the largest group of principals in the District.

Mr. Joe Haynes, a black, is the General Administrative Officer for the School District. Mr. Haynes supervises approximately half of the School District employees in the following departments: Finance, Financial Assets, Transportation, Building and Site Care, Food Service, Warehouse, and Maintenance.

Dr. Yvonne Brooks, a black female, is the Assistant Superintendent for Exceptional Educational Services. 149 employees work under her supervision in the special education area.

Reuben Dilworth, a black, is Director of Secondary Staffing. As such, he interviews and evaluates all applicants for teaching positions in the secondary grades.

Mr. Aaron Jones, a black, is Director of Classified Staffing. He supervises the School District's 1261 classified employees.

Two of the five School Board members are black. James R. Johnson, a black, has been president of the School Board for the past two years.

During the first year of desegregation, only 31% of the School District's principals

were black. As of September 1, 1981, 51% of the School District's elementary principals were black, and 43% of the School District's senior high principals were black. 50% of the School District's junior high principals were black.

### B. Non-Administrative and Supervisory Staff

As of September 1, 1981, the School District employed 69 persons on its Non-Administrative and Supervisory Staff. 31 (45%) were black and 38 (55%) were white.

### C. Classified Employees

As of September 1, 1981, the School District employed 1261 classified employees. 963 (76%) were black and 298 (28%) were white.

Recently the United States Department of Education, Office of Civil Rights, issued a Statement of Findings, concluding that the School District was not discriminating against blacks in hiring, promotions, terms of employment, and teaching assignments. In addition, the testimony established that no judgment has been entered against the School District for race discrimination in employment for more than a decade.

### 3. Transportation

The Plaintiffs do not dispute that the School District is operating a desegregated, unitary system in its transportation services. Joe Haynes, General Administrative Officer for the District, testified that all students living more than nine-tenths of a mile from their assigned school are provided free transportation. Students are assigned to busses in a non-discriminatory manner. The Office of Civil Rights recently issued its Statement of Findings, concluding that the School District was not discriminating against blacks in its transportation policy.

### 4. Extracurricular Activities

Regarding extracurricular activities, the proof established that all extracurricular activities are available to all students within the School District regardless of race. Students of all races are participating in the School District's extracurricular activities. The Office of Civil Rights investigated allegations of discrimination in this area as well, and concluded that the School District was not discriminating against blacks in its extracurricular activities. Without specifically enumerating each extracurricular activity, suffice it to say that the proof established that there was no racial barrier to any student participating in any extracurricular activity.

### 5. Facilities

Likewise, it is undisputed that the School District facilities are desegregated, and that the utilization of said facilities is discrimination-free. Applicants for the use of school facilities must agree in writing not to engage in or permit discrimination while using School District facilities. Another good example of the School District's commitment to continued desegregation of its facilities is its construction of four fully integrated school buildings since entry of this Court's June 22, 1971 order.

### 6. Student Assignment

The student assignment plan for the secondary schools approved by the Fifth Circuit and the student assignment plan for the elementary schools entered by consent of the parties provided for a unitary, fully desegregated student body. Counsel for Plaintiffs did not contest this fact. All desegregation methods suggested by the United States Supreme Court in *Swann v. Charlotte-Mecklenburg Bd. of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and the Fifth Circuit in *Hall v. St. Helena Parish School Board*, 417 F.2d 801 (5th Cir. 1969), were utilized. These methods included busing of blacks and whites, student transfers, clustering, pairing, educational parks and plazas, non-contiguous zoning, discontinuance of use of substandard buildings and appropriate location of new construction.

Although these desegregation plans were implemented with some attendant "white flight", these plans did effectively desegre-

gate the schools to the fullest degree possible "taking into account the practicalities of the situation." *Davis v. Board of School Comm'rs,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). For example, during the 1971–72 school year, although 67% of the School District's elementary students were black, no black students attended an elementary school with more than 90% black enrollment. Conversely, only 9% of the School District's white elementary students attended schools with 60% or more white enrollment. No elementary school had a white enrollment in excess of 62%.

Similarly, the Fifth Circuit approved secondary student assignment plan was effective in desegregating the student bodies of the School District's secondary schools. Although 66% of all secondary students were black in 1971–72, only 37% of the School District's black secondary students attended schools with student bodies of 87% or more black. Only 38% of all white secondary students attended secondary schools with 60% or more white student populations. No secondary school had a white enrollment in excess of 71%, and that school was Whitten Junior High School, located in southwest Jackson, a predominately white neighborhood. Only 3 of 19 secondary schools were 90% or more black, and all were located in inner city, all black neighborhoods.

These statistics compare favorably to the statistics *projected* in the desegregation plan approved by the Fifth Circuit in *Carr v. Montgomery Bd. of Education,* 377 F.Supp. 1123 (M.D.Ala.1974), *aff'd* 511 F.2d 1374 (5th Cir. 1975), *rehearing and rehearing en banc denied,* 511 F.2d 1390 (5th Cir. 1975). Also, experience has proven that *projections* under desegregation plans are more optimistic than the actual *result,* a factor which makes the School District's successful desegregation even more impressive.

The School District operated under the court-approved student assignment plans for more than three years. The student body was effectively desegregated. The appropriate remedy for the previously discriminatory attendance zones had been provided. *Pasadena City Bd. of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976).

■ Having accomplished a unitary student assignment plan, there was no constitutional *requirement* that the School District make year by year adjustments, but there was also no *prohibition* against making adjustments in student attendance zones, unless these modifications were motivated by segregative actions on the part of the School District. *Swann v. Bd. of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Pasadena City Bd. of Education v. Spangler, supra.*

Attendance zones have been adjusted from time to time since 1971. It has not been necessary for the parties to litigate any matter concerning student attendance zones since 1971. On every occasion, the parties have reached agreement as to the modification of these attendance zones. For this reason, there has been no contention, nor could there be, that adjustments in attendance zones since 1971 were motivated by segregative intent.

The most significant attendance zone modification occurred on April 15, 1975, when an opinion and order was entered by consent of the parties incorporating modifications to the student assignment plan for some of the elementary schools. The modifications to the elementary attendance zones were recommended by a Student Assignment Task Force composed of an equal number of black and white administrators of the School District, and were approved by the court-appointed biracial committee. Contrary to Plaintiffs' contentions, the unitary nature of the overall student assignment plan was not affected by implementation of the April 15, 1975 order.

In *Carr v. Montgomery Bd. of Education, supra,* the Fifth Circuit approved a student assignment plan which projected that 51% of all black elementary students would attend schools with student bodies 87% or more black. During the 1975–76 school year, after implementation of the April 15, 1975 court order, only 48% of the School District's black elementary students attend-

ed schools with student bodies of 87% or more black. These statistics are especially enlightening when consideration is given to the fact that during the 1975–76 school year, 73.5% of the School District's elementary students were black, whereas only 50% of the elementary students in the Montgomery, Alabama schools were black when its desegregation plan was approved. Also, under the Fifth Circuit approved Montgomery, Alabama plan, 94.5% of all white elementary students attended elementary schools with 60% or more white student populations. During the 1975–76 school year, only 14.4% of the School District's white elementary students attended elementary schools with 60% or more white enrollment.

The next significant event which affected the School District's student assignment plan occurred during the 1976–77 school year, when the City of Jackson, Mississippi annexed substantial areas to the south and west of the then existing city limits. Many of the schools within the annexed areas had overwhelmingly white student bodies. For instance, Oak Forest Elementary School had a total enrollment of 503 students, and all 503 were white. Woodville Heights Elementary School had a total enrollment of 439, and 405 students were white. Forest Hill had a total of 1778 students, and 1496 were white. Conversely, Woodville Heights had a total enrollment of 439, and 405 were black.

The School District was faced with the challenge of incorporating these racially identifiable schools within the school system and desegregating the schools to the best of its ability. The School District, with the help and recommendations of a biracial student assignment task force, performed admirably in voluntarily desegregating these newly acquired schools. Westside, which had a 98.3% black enrollment, was closed. The black students who formerly attended Westside were rezoned into the predominantly white Forest Hill High School zone and into the predominantly white Oak Forest and Timberlawn elementary zones. Creation of subzones, busing, and modification of attendance zones have resulted in the effective desegregation of Oak Forest, Timberlawn, Woodville Heights and Forest Hill. The following statistics graphically establish this fact. For example, Oak Forest, which had no black students before annexation, now has a student population of 25.9% black students. Timberlawn, which had a 1.7% black enrollment before annexation, now has an 18.2% black enrollment. Woodville Heights, which had a 7.7% black enrollment before annexation, now has a 28.7% black enrollment. Forest Hill, which had a 12% black enrollment before annexation, now has a 31.1% black enrollment. Desegregation of the "annexation schools" was accomplished without incident, and effectively demonstrates the school's commitment to desegregation of its student body.

There are some racially identifiable (90% or more black) schools within the School District today, but these schools are not a vestige of past segregation. Many are the product of a predominantly black (72%) student body. The Fifth Circuit has recognized that one race schools in urban areas with predominantly black student bodies are the product of a preponderant majority of black pupils rather than a vestige of past segregation. In *Calhoun v. Cook*, 522 F.2d 717 (5th Cir. 1975), *rehearing en banc denied*, 525 F.2d 1203 (5th Cir. 1977), the Fifth Circuit approved a student assignment plan which projected that 92 out of the 148 schools in the Atlanta school system would continue to be 90% or more black.

In their petition for rehearing in the *Cook v. Calhoun* case, the Plaintiffs urged that the court should not have affirmed the adjudication of the unitary status of the Atlanta school district because it had never utilized noncontiguous pairing and had never bussed white children into predominantly black schools. Of course, the Jackson School District has utilized both of these devices to segregate its schools, as well as other desegregation devices suggested by the Fifth Circuit. Nevertheless, the Fifth Circuit rejected an attack on its prior decision that Atlanta operated a unitary school system stating:

These assertions are inaccurate. This panel could not and does not depart from prior precedent. It would blink reality and authority, however, to hold the Atlanta school system to be non-unitary because further racial integration is theoretically possible and we expressly decline to do so. See *Carr v. Montgomery Bd. of Education*, D.C., 377 F.Supp. 1123, *aff'd* 511 F.2d 1374 (5th Cir.), *rehearing and rehearing en banc denied* 511 F.2d at 1390 (June 27, 1975), *cert. denied* [423] U.S. [986], 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). We also judicially notice the corresponding declaration of unitary status by Judge Hurbert W. Christianberry relating to the Orleans Parish School System. *Bush v. Orleans Parish School Board*, Civil Action No. 3630 (E.D.La., August 22, 1975). (Emphasis supplied).

█ In addition to its vast majority of black students, segregated housing patterns and demographic changes within certain areas of Jackson have contributed to the existence of some predominantly black schools within the School District. Green, Watkins, Bradley, Dawson, Johnson, Galloway, Poindexter, Whitfield, Clausell, Walton, and Barr schools are located in areas which have experienced a substantial increase in black population from 1970 to 1980. Many other racially identifiable schools, such as Blackburn, Brinkley, Rowan and Lanier are located in all-black areas. However, the existence of these predominantly black schools today does not destroy the unitary nature of the school system. *Carr v. Montgomery Bd. of Education, supra; Swann v. Bd. of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

█ As stated by the United States Supreme Court in *Swann v. Bd. of Education*:

It does not follow that the community served by unitary systems will remain demographically stable, for in a growing, mobile, society, few will do so. Neither school authorities nor district courts are constitutionally required to make year by year adjustments of the racial compositions of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated through the system.

402 U.S. at 31–32, 91 S.Ct. 1283.

Although the School District was not *constitutionally* required to make adjustments in the racial composition of its schools, *Swann v. Bd. of Education, supra*, this Court is impressed with the *voluntary* efforts of the School District in this regard. During the 1974–75 school year, the School District created a Student Assignment Task Force composed of an equal number of black and white administrators. The current chairman of the Task Force, Amos Wright, is black. The Task Force made numerous recommendations which further desegregated many schools.

For example, this Task Force recommended modifications in student attendance zones which increased the black enrollment at Oak Forest Elementary School from 18.4% during the 1980–81 school year to 25.9% during the 1981–82 school year. Forest Hill High School, which had a black enrollment during the 1980–81 school year of 24%, had a black enrollment during the 1981–82 school year of 31%. Timberlawn Elementary which had a 13.6% black enrollment last year has an 18.2% black enrollment this year. Whitten Jr. High School, which had a black enrollment of 26% last year, has a black enrollment of 33% this year. Conversely, Hardy Jr. High School, which had a white enrollment of 11.1% last year had a white enrollment of 18.7% this year.

█ All four schools constructed during the period following entry of the initial desegregation orders are fully desegregated. This is a significant factor to be considered in this Court's determination as to whether the School District is unitary. *United States v. Texas Education Agency*, 467 F.2d 848, 865 (5th Cir. 1971). These schools are the Career Development Center, the North Jackson Elementary School, Siwell Road Jr. High School, and John Hopkins Elementary School. The sites for these new schools were determined by a biracial committee. The Career Develop-

ment Center offers vocational education to students throughout the district. The other three schools were constructed in integrated neighborhoods, so that the students could attend a desegregated school near their home.

The Career Development Center, established by agreement of the parties to this action, is an example of a "magnet school," a concept suggested by the Fifth Circuit as a means of achieving further desegregation. *Tasby v. Estes*, 572 F.2d 1010 (5th Cir. 1978). The Career Development Center offers vocational education to pupils throughout the District, and is fully desegregated in its faculty and student body. During the 1979–80 school year, the racial composition of the student body at the Career Development Center was 40% white and 60% black. During the 1980–81 school year, the racial composition of the student body at the Career Development Center was 33% black and 67% white. During the current school year, 1981–82, the racial composition of the student body at the Career Development Center is 71% black and 29% white.

The Alternative Program was established as adjunct to Brown Elementary School by agreement of the parties in June of 1979. The Alternative Program is another example of a "magnet school." This program offered an alternative approach to education of elementary school students throughout the District by placing more emphasis on individualized instruction. Since its inception, the Alternative Program has been fully integrated at both its student and faculty.

The School District has voluntarily adopted a liberal pupil transfer policy. Under this policy, a pupil may transfer to a school in another attendance zone if the enrollment percentage of the child's race is higher in the school of his attendance zone than the enrollment percentage of his race in the school to which transfer is requested. Although students may transfer for other reasons (i.e. special education pupils), the vast majority of transfers are "desegregation" transfers. Pupils are notified of their right to transfer to a more desegregated school in

a student enrollment information packet given to all students. A copy of the pupil transfer policy is provided upon request to all students. The extensive use of the pupil transfer policy demonstrates its availability and effectiveness. For example, during the 1981–82 school year, 412 black pupils exercised their transfer rights and 147 white students exercised their transfer rights.

In sum, following the successful desegregation of the students in 1970 and 1971, the School District has voluntarily exercised every effort to continue to desegregate its schools to the fullest degree possible. The School District has demonstrated a commitment to continue this process.

The School District has also gone beyond what was constitutionally required in areas other than student attendance in demonstration of its commitment to a quality desegregated education. The Central Office Staff was reorganized and blacks were placed in positions with substantial responsibilities. Four new schools have been built, and all have black principals. All teacher applicants are interviewed by a "screening team" of an equal number of black and white principals. The School District's Reduction in Force Policy was formulated by a committee composed of an equal number of blacks and whites. A reorganization of the School District's Vocational Division was accomplished, and Willie Mott, a black, was appointed its Director. He supervises the largest secondary vocational program in Mississippi.

A system of School District governance, called "Shared Governance", was approved by the School Board. This procedure was developed by a biracial committee of education. Each school has a biracial Shared Governance Committee, including parents and classified employees. They meet monthly to discuss school issues. An Instructional Counsel was formed to meet weekly with the Superintendent to formulate instructional recommendations to the Board of Education. The counsel is composed of an equal number of black and white teachers, assistant superintendents and principals.

■ Plaintiffs do not seriously contest the fact that the School District has long been desegregated, but contends that the District is not yet "unitary", and ready for dismissal from this Court's supervision. Plaintiffs point to the "white flight" that accompanied the desegregation of the School District as evidence that the community does not support public education. However, the existence of "white flight" within a school district is not a deterrent to that school district achieving unitary status. *Calhoun v. Cook, supra.*

Notwithstanding the "white flight" that occurred in Jackson on the desegregation of its schools, this court is convinced that there is substantial community support for the public school system in Jackson. There was no proof that desegregation of the school was accompanied by violence or boycotts. There was no proof that turmoil disturbed the educational process. Indeed, during the early years of desegregation, several biracial groups actively and openly supported public education in Jackson. These included the Chamber of Commerce Task Force, the Jacksonians for Public Education, PTSA Councils, Superintendent's Advisory Committee, and the court-appointed biracial committee.

Rowan Taylor, School Board member and immediate past president of the Jackson Chamber of Commerce, testified about the Chamber of Commerce Task Force, a biracial task force assembled by the Chamber of Commerce to assist and support the public school system. Mr. Taylor's testimony also established the substantial support the Jackson community has shown in the "Adopt-A-School Program," a program by which a local business can "adopt" a school and work with the staff and students of that school to enhance the educational experiences of the children. Leading businesses such as Allstate Insurance, South Central Bell, Deposit Guaranty and First National Banks, Mississippi Baptist Medical Center, and others have adopted a school to show their support for desegregated public education.

Each month the Superintendent meets with the City Council of Parent Teacher Associations. This is a biracial group. A separate biracial group of leading community citizens recently met with the Superintendent for a "Report to the Community" on public education. A biracial group of community leaders has been studying school facilities. They have examined each school in the city. Soon they will make recommendations for improving facilities, including a bond issue.

Testimony by witnesses for the Plaintiffs and Defendant, both black and white, establish the substantial support for the Jackson Public Schools from both blacks and whites in the Jackson Community. Testimony of Robert Fortenberry, Superintendent, established that blacks and whites both within and without the school system are actively participating and contributing to programs and committees sponsored by the school system. His testimony also established that the School District makes extensive use of biracial committees in making management level decisions. An example is the biracial committee of teachers, parents and administrators which formulated the School District's Reduction in Force Policy which was ultimately implemented and approved by the School Board.

As stated by the Court in *Carr v. Montgomery Bd. of Education, supra*:

A successful school system demands support from the community—both black and white. To facilitate this support, this court has attempted to avoid imposing rigid or inflexible requirements on the board and, where possible, has allowed the parties to work out their own differences. In this way, this court has constantly strived for a workable solution to the problems encountered in converting from a dual system to a "unitary system in which racial discrimination would be eliminated root and branch." Secondly, all parties to this litigation share the same goal: establishment of a 'desegregated unitary and nonracial school system.' Every court that has reviewed the record of this litigation has observed the

differences between the parties have been unusually small. Moreover, the Montgomery County School Board has been repeatedly complimented for its good faith efforts to comply with the requirements of law. It is worthy of pride that the ten year history of this case has been characterized throughout by cooperation from all the participants.

The above quotation is equally applicable to the case at bar for the time period from 1971 until the present. All orders entered since 1971 have been entered by consent of the parties. Judge John Brown, former Chief Judge of the Fifth Circuit, and this Court have complimented the parties for their cooperation in solving the problems encountered in converting to and maintaining a unitary school system. There have been convincing efforts by both blacks and whites in the community to establish a significant dialogue with school officials.

Notwithstanding the good faith of the School District in its desegregation efforts, witnesses for the Plaintiffs testified that they "feared" that this School District would resegregate if the Motion to Dismiss was granted. However, they were unable to produce any credible evidence to justify their fears. The Plaintiffs request that the Court continue its jurisdiction over the School District as a "big stick" to prevent future unlawful conduct. In rejecting this request, this Court adopts with approval Judge Keady's holding in the *United States v. Corinth Mun. Separate School District,* 414 F.Supp. 1336 (N.D.Miss.1976):

> If school districts maintain good faith compliance with federal court desegregation decrees for the requisite period of time without serious incident of racial discrimination in educational policies, justice under our federal system dictates that judicial power of the United States courts, by injunctive order and mandates, cease, and that responsibility for operating local public schools be left in the hands of authorities designated by the states. Any other course would, in our opinion, stand our system of federalism on its head, by invading the authority of the states and its educational agents in excess of the demands of the Fourteenth Amendment.

414 F.Supp. 1345, note 14.

█ This Court has no further constitutional function to perform in this school system. The journey of the Jackson School District from *Brown I* to *Swann v. Charlotte-Mecklenburg Bd. of Education* has been successfully completed. Since this is so, the words of Chief Justice Burger, speaking for a unanimous court, are appropriate:

> At some point, these school authorities and others like them should have achieved full compliance with this Court's decision in Brown I. The systems would then be 'unitary' in the sense required by our decisions in Green [*Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716] and Alexander [*Alexander v. Holmes County Board of Education,* 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19]
>
> It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies [or faculties] once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary. 402 U.S. at 31–32, 91 S.Ct. at 1283, 28 L.Ed.2d at 575.

Therefore, based on the above findings and conclusions, it is ordered and adjudicated that:

(1) The School District has operated a unitary school system since 1971;

(2) The School District has complied with all desegregation directives and orders of this Court;

(3) The School District's Motion to Dismiss be, and the same is hereby sustained;

(4) This action shall be, and the same hereby is finally dismissed and terminated on the docket of this Court.